UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 11-CV-23455-FAM

LAURA YELITZA CIFUENTES, and
MERLE DE LAS MERCEDES SILVA CASTRO,
*on their own behalf, and*
*on behalf of all those similarly situated*,

       Plaintiffs,

v.

REGIONS BANK,

       Defendant.
_____/

### AMENDED CLASS-ACTION COMPLAINT

       Plaintiffs, Laura Yelitza Cifuentes ("Mrs. Cifuentes"), and Merle de las Mercedes Silva Castro ("Ms. Castro") (jointly referred to as "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), sue Defendant Regions Bank ("Regions") and state as follows:

### INTRODUCTION

       1.      This action arises out of and concerns the sale of securities by an unregistered dealer in violation of Fla. Stat. § 517.12(1). Based on its conduct and actions, Regions qualifies as a *"person making the sale"* of those securities as that term is used in Fla. Stat. § 517.211(1). As such, Regions is liable to the purchasers of those securities – *i.e.*, Plaintiffs and the Class – in an action under § 517.211(1).

## PARTIES

2. Plaintiffs, Mrs. Cifuentes and Ms. Castro, both are residents of Colombia.[1]

3. Defendant, Regions, is an Alabama state-chartered bank with its principal place of business in Birmingham, Alabama.[2]

## RELEVANT NON-PARTIES

4. U.S. Pension Trust Corp. ("USPTC") and U.S. College Trust Corp. ("USCTC") (hereinafter often referred to jointly as "USPT") are Florida corporations that were formed in 1995 and 1997, respectively. During all relevant times, they operated as the same company with the same employees. During all relevant times, they operated from offices that were maintained in Miami-Dade County, Florida – but neither USPTC nor USCTC ever registered with the SEC or the State of Florida as brokers, dealers, investment advisers, or in any other investment-related capacity.

## JURISDICTION AND VENUE

5. This Court possesses subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(2), as this is a diversity suit for damages in excess of $75,000, excluding interest, costs, and attorney's fees.

---

[1] Mrs. Castro is the surviving spouse and Ms. Castro is one of two surviving daughters of Guido E. Cifuentes ("Mr. Cifuentes"). Mr. Cifuentes invested in the security at issue on multiple occasions throughout the Class Period (defined below). And for the reasons set forth below, Regions is liable to Mr. Cifuentes under Fla. Stat. § 517.211(1). Mr. Cifuentes, however, passed away on or about December 7, 2009. Accordingly, all claims arising under § 517.211(1) now belong to the heirs of Mr. Cifuentes, who died intestate – *i.e.,* he did not execute a written will pursuant to which he designated particular heirs or beneficiaries of his estate. As such, pursuant to Colombian law of intestacy, his claims against Regions were distributed, by operation of law, to Mrs. Castro (who took a 1/2 share), Mr. Castro (who took a 1/4 share), and the other surviving daughter of Mr. Cifuentes (who is a minor and who also took a 1/4 share). Plaintiffs now bring the claims that they inherited under Colombian law such that "Plaintiffs" effectively is a reference to Mr. Cifuentes. And the other surviving daughter, who is the third beneficiary of the estate of Mr. Cifuentes, is a member of the putative Class.

[2] Hereinafter, all references to Regions shall be deemed also to refer to Union Planters Bank, which merged with Regions in July 2004.

6. This Court also possesses subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because:

    a. the putative Class consists of more than 100 class members, at least one of whom – *e.g.* the Plaintiffs – is diverse from Regions; and

    b. the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

7. Jurisdiction and venue are proper because Regions conducts business in the Southern District of Florida and because many of the acts and transactions that violated Fla. Stat. §§ 517.12(1) and 517.211(1) occurred in the Southern District of Florida.

8. Alternatively, jurisdiction and venue are proper in the Southern District of Florida, Miami Division, because the situs of the Trust Accounts and Trust Agreements at issue in this case (both of which are defined and explained below) was Miami-Dade County, Florida; the members of the putative Class delivered funds to Regions' branch office in Coral Gables, Florida; and because the individual Trust Agreements between Regions and Plaintiffs and the members of the Class provide for exclusive venue for any litigation in Miami-Dade County, Florida.

## DISCLAIMER ALLEGATIONS

9. This action does not allege, concern, or otherwise relate to, any misrepresentation or omission made by Regions or USPT in the course of soliciting, recommending, or selling a covered security.

10. Likewise, this action does not allege, or concern or otherwise relate to allegations, that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

11. Plaintiffs do not allege that any representations described herein were false or misleading or that Plaintiffs relied on any false or misleading statements or omissions.

## BACKGROUND INFORMATION
(REGARDING THE UNDERLYING SALE OF SECURITIES BY AN UNREGISTERED DEALER)

12.     USPT generated more than $250 million in sales proceeds via the sale of securities to more than 14,000 individuals, including Plaintiffs and the Class (many of whom reside in Latin America). The securities were multi-year investment plans ("Investment Plans"). Plaintiffs and members of the Class could contribute funds to their respective Investment Plans at any time in the exercise of their discretion and thereby increase their position in the security. All contributions to those Investment Plans then were pooled, and those pooled funds then were used to purchase U.S. mutual funds, such that investors indirectly could invest in U.S. mutual funds.

13.     Notwithstanding that USPT was engaged in the wide-spread sale of securities, USPT never registered with the Securities Exchange Commission. As such, USPT unlawfully engaged in the sale of securities as an unregistered dealer. There is no dispute about that. Indeed, that matter already has been adjudicated. Specifically, on September 30, 2010, U.S. District Judge Jose E. Martinez entered final judgment against USPT for violation of the registration provisions under Section 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act").[3]

14.     But because USPT operated out of offices maintained in Miami-Dade County, Florida, USPT was required to register not only with the SEC, but also with the State of Florida. But USPT never did register with the State of Florida. As such, USPT ran afoul not only of Section 15(a)(1) of the Exchange Act, but also the corresponding registration provision of Florida's Blue Sky Law, Fla. Stat. § 517.12(1).[4]

---

[3] *See* Final Judgment [D.E. 287] entered in U.S. Securities and Exchange Commission v. U.S. Pension Trust Corp., *et al*., Case No. 07-22570-CIV-MARTINEZ.

[4] In pertinent part, Fla. Stat. § 517.12(1) states that *"[n]o dealer . . . shall sell . . . any securities from offices in this state . . .unless the person has been registered with the office pursuant to the provision of this section."*

15. Plaintiffs and the Class did not know about, had no reason to know about, and, even in the exercise of due diligence, could not have discovered that USPT improperly was engaging in the unlawful sale of securities as an unregistered dealer before that matter was adjudicated by Judge Martinez on September 30, 2010.

### GENERAL ALLEGATIONS

16. The Investment Plans that are at the heart of this case required each investor to establish a trust account ("Trust Account") and thereby enter into a trust agreement ("Trust Agreement") with a trustee ("Trustee"). Essentially, the way the Investment Plans worked was that the funds to be invested would be deposited into a Trust Account. All such funds then were pooled, and the Trustee then would purchase U.S. mutual funds, with each Trust Account then holding an interest in those mutual funds.

17. Pursuant to a master agreement executed by and between Regions and USPT (the "Master Agreement"), Regions entered into an individual Trust Agreement with, and thereby served as the Trustee for, each and every investor who invested funds in an Investment Plan from October 2001 through October 2010.[5]

18. It was unavoidable that Regions would serve as the Trustee for each and every investor. That is so because the Investment Plans were structured in such a way that no investor could invest funds in an Investment Plan without first entering into a Trust Agreement with Regions. As such, entering into a Trust Agreement with Regions was a necessary condition precedent and part

---

[5]Specifically, the Investment Plans were offered for sale to *new* investors until January 2008, when Regions stopped accepting contributions from *new* investors. Regions stopped accepting contributions from *existing* Investment Plan owners in August 31, 2009. Regions then ceased serving as the Trustee for all Investment Plan owners on or about October 25, 2010, when the Honorable Celeste H. Muir, Circuit Judge for the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, granted a motion filed by Regions allowing it to resign as the Trustee for all Investment Plan owners. A copy of the Master Agreement is attached as **Exhibit A**.

and parcel of investing in an Investment Plan. That is to say, the Trust Agreements with Regions were the *sine qua non* of investing in the Investment Plans. And absent the execution of a Trust Agreement with Regions, no investor could invest in an Investment Plan. Regions thus was the gate-keeper of the gate through which the sale of all securities had to pass.

19. Regions, however, was not a passive gatekeeper, but rather Regions engaged in myriad acts to promote and solicit investments in the Investment Plans.

20. To begin, Regions was integrally involved in the marketing of the Investment Plans. For example:

    a. By agreement by and between Regions and USPT, as reflected in the Master Agreement, Regions' name and logo were featured prominently in the materials used to market the Investment Plans (the "Marketing Materials").

    b. All such Marketing Materials were subject to prior written approval by Regions.

    c. Any subsequent changes to the Marketing Materials likewise were subject to review and approval by Regions.

    d. Regions even played a hand in determining what documentation and information would be included in the Marketing Materials provided to potential investors, including, but not limited to:

        i. a due diligence questionnaire (in a form required by Regions);

        ii. a summary document providing an explanation of the services to be provided by Regions (in a form required by Regions); and

        iii. whatever additional documents Regions might require in the future.

      e.      Regions also developed the form Trust Agreement that was used for each and every investor.

      f.      And Regions even created a video that was posted on USPT's website to help promote and solicit investments in the Investment Plans.

21.    Regions also was integrally involved in training the agents of USPT regarding the promotion and solicitation of investments in the Investment Plans. For example:

      a.      Regions personnel regularly attended sales conferences where Regions taught USPT agents how to promote and solicit investments in the Investment Plans.

      b.      One Regions employee – Filipe Larcada, who had the title Executive Vice President, Trust Manager for Regions Florida ("Mr. Larcada") – took a particularly active role in promoting and soliciting investments in the Investment Plans on behalf of Regions. Mr. Larcada met with USPT on a regular basis to review marketing and sales strategies and protocol. And Mr. Larcada regularly attended sales conventions to meet with officers and sales agents of USPT. For example, Mr. Larcada attended sales conventions in Washington, D.C., San Francisco, Spain, Brazil, Colombia, Ecuador, and Argentina to meet with officers and sales agents of USPT to teach them how to promote and solicit investments in the Investment Plans.[6]

      c.      Another Regions officer – Angel Medina, who was held out as a "President" – accompanied Mr. Larcada to the sales convention in Brazil to aid Mr. Larcada in teaching officers and agents of USPT how to promote and solicit investments in the Investment Plans.

22.    Regions also regularly interfaced with prospective (and actual) investors so as to promote and solicit investments in the Investment Plans on behalf of Regions. For example:

---

[6]Eventually, Mr. Larcada's involvement with USPT went even further. In or about early 2008, he began dating Ms. Iliana Maceiras, who was, upon information and belief, the President of USPT. And in or about early 2009, they began living together.

  a. Mr. Larcada and others regularly spoke to prospective investors and attended sales meetings to promote and solicit investments in the Investment Plans from potential investors. For example, Mr. Larcada attended sales meetings in Colombia, Ecuador, and Argentina to promote and solicit investments in the Investment Plans from potential investors on behalf of Regions.

  b. And when Mr. Larcada could not attend a sales meeting in Peru, another Regions employee – Jorge Milanes, who held the title of "VP Trust Officer" – attended the sales meeting in his stead to promote and solicit investments in the Investment Plans on behalf of Regions.

  c. Mr. Larcada regularly gave "PowerPoint" presentations at sales meetings and conventions and, after such presentations, he regularly entertained question-and-answer sessions with potential investors so as to promote and solicit investments in the Investment Plans.

23. Regions did all of this, of course, for money. Indeed, Regions was motivated to promote and solicit investments in the Investment Plans because Regions profited on every dollar that was invested in the Investment Plans. Specifically, Regions received an annual fee equal to 1.5% of the value of the total assets held in trust for the collective investors – a fee that Regions then split, evenly, with USPT. And by virtue thereof, Regions received millions of dollars.[7]

24. In addition to all the foregoing acts of promotion and solicitation, Regions otherwise was inextricably intertwined in the process and protocol of promoting, soliciting, and administering investments in the Investment Plans. For example:

  a. All account-opening documents had to be routed to Regions before a client could open up a Trust Account in conjunction with an Investment Plan.

---

[7]But that was not the full extent of Regions' financial motivation to promote and solicit investments in the Investment Plans. In addition to the fee described above, Regions also received 12(b)-1 fees paid by the mutual funds that were purchased by Regions, in its role as the Trustee for the benefit of the investors. Again, those fees were split even by and between Regions and USPT. By virtue thereof, Regions received millions more.

  b.  Regions did not keep independent records concerning the value of investors' Trust Accounts, but rather relied on USPT to keep its records.

  c.  USPT granted general access to its computer database to Regions' EVP, who possessed a "login" and "password" to access the entire accounting system for USPT.

25. Based on all the foregoing, it should come as no surprise that the SEC not only went after USPT, but also Regions, *inter alia,* for aiding and abetting in the sale of securities by an unregistered dealer.

26. But perhaps even more interesting, Regions settled with SEC ***on the very day*** it was charged. Indeed, the SEC brought suit against Regions on September 9, 2009.[8] And although Regions was careful to insert language stating that it was not *"admitting or denying the allegations of the complaint,"* Regions settled with the SEC ***that very same day*** by entering into a "Consent of Defendant Regions Bank to Entry of Final Judgment."[9]

27. And in conjunction with that consent, the Court ultimately entered a "Final Judgment as to Defendant Regions Bank" requiring Regions to pay disgorgement of $1 and a civil penalty in the amount of $1,000,000.[10]

28. Regions entered into that rapid-fire, one-day, million-dollar settlement with the SEC with the hopes that Regions could keep this matter under wraps and escape broader civil liability to the numerous aggrieved investors – such as Plaintiffs and the Class.

---

[8] *See* Complaint [D.E. 1] filed in <u>SEC v. Regions Bank</u>, Case No. 09-22821-CIV-Cooke.

[9] *See* Consent of Defendant Regions Bank To Entry of Final Judgment [D.E. 3] filed in <u>SEC v. Regions Bank</u>, Case No. 09-22821-CIV-Cooke.

[10] *See* Final Judgment as To Defendant Regions Bank [D.E. 12] entered in <u>SEC v. Regions Bank</u>, Case No. 09-22821-CIV-Cooke.

### LIABILITY UNDER FLA. STAT. § 517.211(1)

29.     In pertinent part, Fla. Stat. § 517.211(1) states as follows:

Every sale made in violation of . . . s. 517.12(1) . . . may be rescinded at the election of the purchaser and . . . **[e]ach person making the sale** . . . is jointly and severally liable to the purchaser in an action for rescission.[11]

30.     Here, the promoting and solicitation of investments in the Investment Plans plainly was in violation of Fla. Stat. § 517.12(1) insofar as it already has been adjudicated that USPT was engaged in business as an unregistered dealer.

31.     And based on all the foregoing facts, Regions qualifies as a *"person making the sale,"* as that term is used in Fla. Stat. § 517.211(1).

32.     As such, Regions is liable to Plaintiffs and all members of the Class in an action under Fla. Stat. § 517.211(1).

33.     In addition to all damages recoverable thereunder, Regions also is liable for interest on the full amount paid by all purchasers at the legal rate prescribed by Fla. Stat. § 55.03.

34.     And Regions also is liable to Plaintiffs and the Class for their attorneys' fees pursuant to Fla. Stat. § 517.211(6).

### CLASS ALLEGATIONS

35.     Plaintiffs bring this putative class action against Defendant pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and on behalf of a class consisting of:

**All persons and entities who made investments in an Investment Plan (the "Class") between September 21, 2006 and August 31, 2009 ("Class Period").[12]**

---

[11] Emphasis added.

[12] Excluded from the Class are any employees, agents, or principals of USPT or Regions.

36. There are thousands of members in the proposed Class (the "Class Members"), the majority of whom reside outside of the United States and are geographically dispersed throughout Latin America such that joineder of all Class members would be impracticable.

37. Plaintiffs' claims are typical of the claims of all Class members as all such claims arise from the sale of the same securities, turn on the same underlying registration violation, and all provide for the same remedy.

38. There are questions of fact and law that are common to all members of the Class. Among the questions of fact and law that are common to all members of the Class are:

    a. whether USPT violated Fla. Stat. § 517.12(1) by engaging in the offer and sale of securities as an unregistered dealer;

    b. whether Regions qualifies as a *"person making the sale"* as that term is used in Fla. Stat. § 517.211(1); and

    c. whether Regions is liable to Plaintiffs and the Class in an action under Fla. Stat. § 517.211(1).

39. Plaintiffs will fairly and adequately protect the interests of all Class Members and has retained counsel competent and experienced in class-action litigation.

40. The common questions of fact and law predominate over any individualized questions specific to particular members of the Class.

41. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of thousands of Class members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small compared to the Class-wide damages, the expense and burden of individual litigation make it impracticable, if not impossible, for Class members to redress the wrong done to them on an

individual basis.  Moreover, there will be no difficulty managing this action as a class action.

## COUNT I
[Rescission for Violation of Fla. Stat. § 517.211(1)]

42.     Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 - 41, *supra*.

43.     Plaintiffs, on their own behalf and on behalf of the Class, assert claims against Regions for rescission under Fla. Stat. § 517.211(1).

44.     In pertinent part, Fla. Stat. § 517.211(1) states as follows:

> Every sale made in violation of . . . s. 517.12(1) . . . may be rescinded at the election of the purchaser and . . . **[e]ach person making the sale** . . . is jointly and severally liable to the purchaser in an action for rescission.[13]

45.     Here, the sale of the Investment Plans plainly was in violation of Fla. Stat. § 517.12(1) insofar as it already has been adjudicated that USPT was engaged in business as an unregistered dealer.

46.     And based on all the foregoing facts set forth in paragraphs 16 - 24, *supra*, Regions plainly qualifies as a *"person making the sale,"* as that term is used in Fla. Stat. § 517.211(1).

47.     As such, Regions is liable to Plaintiffs and all members of the Class in an action under Fla. Stat. § 517.211(1).

48.     In addition to all damages recoverable thereunder, Regions also is liable for interest on the full amount paid for all Investment Plans by all purchasers at the legal rate prescribed by Fla. Stat. § 55.03.

49.     And Regions also is liable to Plaintiffs and the Class for their attorneys' fees pursuant to Fla. Stat. § 517.211(6).

---

[13]Emphasis added.

## **R**ELIEF **R**EQUESTED

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, respectfully request that this Court:

(A)  Certify this action as a class under Rule 23 Fed. R. Civ. P.;

(B)  Appoint Plaintiffs as Class Representatives;

(C)  Appoint the undersigned counsel as Class Counsel;

(D)  Award Plaintiffs and the Class their recovery against Regions, including prejudgment interest, pursuant to Fla. Stat. § 517.211(1);

(E)  Award Plaintiffs and the Class their reasonable attorneys' fees, pursuant to Fla. Stat. § 517.211(6); and

(F)  Award Plaintiffs and the Class such further relief as is appropriate in the interests of justice.

## **D**EMAND FOR **J**URY **T**RIAL

Plaintiffs on their own and on behalf of the Class request a jury trial on any and all claims for which a trial by jury is permitted by law.

Respectfully submitted,

By:  /s/ David Rothstein, Esq.

DAVID ROTHSTEIN, ESQ.
 Fla. Bar No.: 0056881
 drothstein@dkrpa.com
JEFFREY KAPLAN, ESQ.
 Fla. Bar No.: 39977
 jkaplan@dkrpa.com
LORENZ MICHEL PRÜSS, ESQ.
 Fla. Bar No.: 581305
 lpruss@dkrpa.com
DIMOND KAPLAN & ROTHSTEIN, P.A.
Offices at Grand Bay Plaza
2665 South Bayshore Drive, Penthouse 2B
Miami, Florida 33133
*Attorneys for Plaintiffs and the Class*

JAMES D. SALLAH, ESQ.
 Fla. Bar No.:  0092584
 jds@sallahcox.com
JOSHUA A. KATZ, ESQ.
 Fla. Bar No.: 0848301
 jkatz@sallahcox.com
SALLAH & COX, LLC
2101 Corporate Blvd., Suite 218
Boca Raton, FL  33431
*Attorneys for Plaintiffs and the Class*

SCOTT L. SILVER, ESQ.
 Fla. Bar No.: 095631
 silver@stockattorneys.com
ADOLFO J. ANZOLA, ESQ.
 Fla. Bar No.: 19084
 anzola@stockattorneys.com
JANINE D. GARLITZ, ESQ.
 Fla. Bar. No.: 41045
 garlitz@stockattorneys.com
BLUM & SILVER, LLP
11780 W. Sample Road, Suite 103
Coral Springs, FL 33065
*Attorneys for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on February 17, 2012, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF and served upon: Josh Lerner, Esq., Rumberger, Kirk & Caldwell, 80 SW 8th Street, Suite 3000, Miami, Florida 33130.

By: /s Lorenz Michel Prüss
Lorenz Michel Prüss